## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| PAUL RUCKEL, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) ) ) ) |
| FORD MOTOR COMPANY, JAMES PATRICK HACKETT, ALAN MULALLY, MARK FIELDS and ROBERT L. SHANKS, | ) ) ) ) ) |
| Defendants. | ) ) ) |

**Civil Action No.:**

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff Paul Ruckel ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ford Motor Company ("Ford" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff

believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Ford securities between February 18, 2014 and October 26, 2017, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Ford Motor Company designs, manufactures, and services cars and trucks. The Company also provides vehicle-related financing, leasing, and insurance through its subsidiary.

3.      Founded in 1903, the Company is headquartered in Dearborn, Michigan and its shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "F."

4.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) flaws in the

Company's manufacturing processes, supply chain, and/or quality control rendered at least 841,000 Ford vehicles unsafe to drive; (ii) the foregoing issues, when revealed, would foreseeably subject Ford to additional regulatory scrutiny and impact the Company's profitability; and (iii) as a result, Ford's public statements were materially false and misleading at all relevant times.

5.     On October 27, 2017, the U.S. National Highway Traffic Safety Administration ("NHTSA") announced a preliminary investigation into 841,000 Ford vehicles, citing concerns that the vehicles' steering wheels could detach while the vehicles are in motion.  NHTSA stated that it is specifically investigating 2014-2016 model Ford Fusion sedans.

6.     On this news, Ford's share price fell $0.21, or 1.71%, to close at $12.06 on October 27, 2017.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

10.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).   Ford's principal executive offices are located within this Judicial District.

11.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

12.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Ford common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.     Defendant Ford is incorporated in Delaware with its principal executive offices located at One American Road, Dearborn, Michigan 48126. Ford's common stock trades on the NYSE under the ticker symbol "F."

14.     Defendant James Patrick Hackett ("Hackett") has served as the Company's Chief Executive Officer ("CEO"), President and Director since May 2017.

15.    Defendant Alan Mulally ("Mulally") served as the Company's CEO and President from September 2006 until July 2014.

16.    Defendant Mark Fields ("Fields") served as the Company's CEO and President from July 2014 until May 2017.

17.    Defendant Robert L. Shanks ("Shanks") has served at all relevant times as the Company's Chief Financial Officer ("CFO") and Executive Vice President.

18.    The defendants referenced above in ¶¶ 14-17 are sometimes collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

19.    Ford Motor Company designs, manufactures, and services cars and trucks. The Company also provides vehicle-related financing, leasing, and insurance through its subsidiary.

### Materially False and Misleading Statements Issued During the Class Period

20.    The Class Period begins on February 18, 2014, when Ford filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2013 (the "2013 10-K"). For the quarter, Ford reported net income of $3.06 billion, or $0.75 per diluted share, on revenue of $37.57 billion, compared to net income of $1.59

billion, or $0.40 per diluted share, on revenue of $36.24 billion for the same period in the prior year. For fiscal year 2013, Ford reported net income of $7.17 billion, or $1.77 per diluted share, on revenue of $146.91 billion, compared to net income of $5.66 billion, or $1.42 per diluted share, on revenue of $133.55 billion for fiscal year 2012.

21.     In the 2013 10-K, the Company stated, in relevant part:

**Safe.** Vehicle safety is a critical part of our brand promise to Go Further. We are specifically committed to designing and manufacturing vehicles that achieve high levels of performance in real-world safety and meet or exceed all regulatory requirements for safety. Ford remains among the leaders in vehicle safety, earning a total of 91 "Top Safety Picks" from the Insurance Institute for Highway Safety ("IIHS")—more than any other manufacturer in the eight-year history of that crash testing program. For the 2013 model year, 13 of our vehicles earned Top Safety Picks from IIHS.

We aim to give customers peace of mind and make the world safer by developing advanced safety technologies and making them available across a wide range of vehicles.

22.     Under the heading "ITEM 1. Business," rather than advise its investors of any specific shortcomings in the Company's manufacturing processes, supply chain, and/or quality control, Ford merely offered the following boilerplate recitation:

**Vehicle Safety**

*U.S. Requirements.* The National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act") regulates vehicles and vehicle equipment in two primary ways. First, the Safety Act prohibits the

sale in the United States of any new vehicle or equipment that does not conform to applicable vehicle safety standards established by NHTSA. Meeting or exceeding many safety standards is costly, in part because the standards tend to conflict with the need to reduce vehicle weight in order to meet emissions and fuel economy standards. Second, the Safety Act requires that defects related to motor vehicle safety be remedied through safety recall campaigns. A manufacturer is obligated to recall vehicles if it determines the vehicles do not comply with a safety standard. Should we or NHTSA determine that either a safety defect or noncompliance exists with respect to any of our vehicles, the cost of such recall campaigns could be substantial.

23.     Similarly, under the heading "ITEM 1A. Risk Factors," Ford merely advised investors as follows:

> ***The discovery of defects in vehicles resulting in delays in new model launches, recall campaigns, or increased warranty costs.*** Meeting or exceeding many government-mandated safety standards is costly and often technologically challenging, especially where standards may conflict with the need to reduce vehicle weight in order to meet government-mandated emissions and fuel-economy standards. Government safety standards also require manufacturers to remedy defects related to vehicle safety through safety recall campaigns, and a manufacturer is obligated to recall vehicles if it determines that the vehicles do not comply with a safety standard. In addition, the introduction of new and innovative features and technology to our vehicles could increase the risk of defects or customer dissatisfaction. Should we or government safety regulators determine that a safety or other defect or a noncompliance exists with respect to certain of our vehicles prior to the start of production, the launch of such vehicle could be delayed until such defect is remedied. The costs associated with any protracted delay in new model launches necessary to remedy such defects, or the cost of recall campaigns or warranty costs to remedy such defects in vehicles that have been sold, could be substantial.

24.     The 2013 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX")  by Defendants Mulally and Shanks, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

25.     On May 1, 2014, Ford filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q").  For the quarter, Ford reported net income of $989 million, or $0.24 per diluted share, on revenue of $35.87 billion, compared to net income of $1.61 billion, or $0.40 per diluted share, on revenue of $35.64 billion for the same period in the prior year.

26.     The Q1 2014 10-Q contained signed certifications pursuant to SOX by Defendants Mulally and Shanks, stating that the financial information contained in the Q1 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

27.     On July 31, 2014, Ford filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q").  For the quarter, Ford reported net income of $1.31 billion, or $0.32 per diluted share, on revenue of $37.41 billion,

compared to net income of $1.23 billion, or $0.30 per diluted share, on revenue of $37.92 billion for the same period in the prior year.

28.    The Q2 2014 10-Q contained signed certifications pursuant to SOX by Defendants Fields and Shanks, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

29.    On October 31, 2014, Ford filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").  For the quarter, Ford reported net income of $835 million, or $0.21 per diluted share, on revenue of $34.92 billion, compared to net income of $1.27 billion, or $0.31 per diluted share, on revenue of $35.77 billion for the same period in the prior year.

30.    The Q3 2014 10-Q contained signed certifications pursuant to SOX by Defendants Fields and Shanks, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

31.    On February 13, 2015, Ford filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 10-K").  For the quarter, Ford reported net income of $52 million, or $0.01 per diluted share, on revenue of

$35.87 billion, compared to net income of $3.06 billion, or $0.75 per diluted share, on revenue of $37.57 billion for the same period in the prior year.  For fiscal year 2014, Ford reported net income of $1.23 billion, or $0.31 per diluted share, on revenue of $144.07 billion, compared to net income of $7.17 billion, or $1.77 per diluted share, on revenue of $146.91 billion for fiscal year 2013.

32.     In the 2014 10-K, Ford failed to disclose to its investors any specific shortcomings in the Company's manufacturing processes, supply chain, and/or quality control.  Instead, under the headings "ITEM 1. Business" and "ITEM 1A. Risk Factors," Ford merely reiterated substantially the same boilerplate recitations regarding vehicle safety, NHTSA regulations, and the impact of recalls contained in the Company's 2013 10-K, quoted in relevant part *supra* at ¶¶ 22-23.

33.     The 2014 10-K contained signed certifications pursuant to SOX by Defendants Fields and Shanks, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

34.     On April 28, 2015, Ford filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q").  For the quarter, Ford reported net income of $1.15 billion, or $0.29 per diluted share, on revenue of $33.90 billion,

compared to net income of $989 million, or $0.24 per diluted share, on revenue of $35.87 billion for the same period in the prior year.

35.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Fields and Shanks, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

36.     On July 28, 2015, Ford filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q").  For the quarter, Ford reported net income of $2.16 billion, or $0.54 per diluted share, on revenue of $37.26 billion, compared to net income of $1.31 billion, or $0.32 per diluted share, on revenue of $37.41 billion for the same period in the prior year.

37.     The Q2 2015 10-Q contained signed certifications pursuant to SOX by Defendants Fields and Shanks, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

38.     On October 27, 2015, Ford filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, Ford reported net income of $2.19 billion, or $0.55 per diluted share, on revenue of $38.14

billion, compared to net income of $835 million, or $0.21 per diluted share, on revenue of $34.92 billion for the same period in the prior year.

39.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Fields and Shanks, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

40.     On February 11, 2016, Ford filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 10-K").  For the quarter, Ford reported net income of $1.86 billion, or $0.47 per diluted share, on revenue of $40.25 billion, compared to net income of $52 million, or $0.01 per diluted share, on revenue of $35.87 billion for the same period in the prior year.  For fiscal year 2015, Ford reported net income of $7.37 billion, or $1.84 per diluted share, on revenue of $149.55 billion, compared to net income of $1.23 billion, or $0.31 per diluted share, on revenue of $144.07 billion for fiscal year 2014.

41.     In the 2015 10-K, Ford failed to disclose to its investors any specific shortcomings in the Company's manufacturing processes, supply chain, and/or quality control.  Instead, under the headings "ITEM 1. Business" and "ITEM 1A. Risk Factors," Ford merely reiterated substantially the same boilerplate recitations regarding vehicle safety, NHTSA regulations, and the impact of recalls contained

in the Company's 2013 10-K and 2014 10-K, quoted in relevant part *supra* at ¶¶ 22-23.

42.    The 2015 10-K contained signed certifications pursuant to SOX by Defendants Fields and Shanks, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

43.    On April 28, 2016, Ford filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q").  For the quarter, Ford reported net income of $2.45 billion, or $0.61 per diluted share, on revenue of $37.71 billion, compared to net income of $1.15 billion, or $0.29 per diluted share, on revenue of $33.90 billion for the same period in the prior year.

44.    The Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Fields and Shanks, stating that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

45.    On July 28, 2016, Ford filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q").  For the quarter, Ford reported net income of $1.97 billion, or $0.49 per diluted share, on revenue of $39.48 billion,

compared to net income of $2.16 billion, or $0.54 per diluted share, on revenue of $37.26 billion for the same period in the prior year.

46.    The Q2 2016 10-Q contained signed certifications pursuant to SOX by Defendants Fields and Shanks, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

47.    On October 27, 2016, Ford filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q").  For the quarter, Ford reported net income of $957 million, or $0.24 per diluted share, on revenue of $35.94 billion, compared to net income of $2.19 billion, or $0.55 per diluted share, on revenue of $38.14 billion for the same period in the prior year.

48.    The Q3 2016 10-Q contained signed certifications pursuant to SOX by Defendants Fields and Shanks, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

49.    On February 9, 2017, Ford filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016 (the "2016 10-K").  For the quarter, Ford reported a net loss of $783 million, or $0.20 per diluted share, on revenue of

$38.65 billion, compared to net income of $1.86 billion, or $0.47 per diluted share, on revenue of $40.25 billion for the same period in the prior year.  For fiscal year 2016, Ford reported net income of $4.59 billion, or $1.15 per diluted share, on revenue of $151.80 billion, compared to net income of $7.37 billion, or $1.84 per diluted share, on revenue of $149.55 billion for fiscal year 2015.

50.    In the 2016 10-K, Ford failed to disclose to its investors any specific shortcomings in the Company's manufacturing processes, supply chain, and/or quality control.  Instead, under the headings "ITEM 1. Business" and "ITEM 1A. Risk Factors," Ford merely reiterated substantially the same boilerplate recitations regarding vehicle safety, NHTSA regulations, and the impact of recalls contained in the Company's 2013 10-K, 2014 10-K, and 2015 10-K, quoted in relevant part *supra* at ¶¶ 22-23.

51.    The 2016 10-K contained signed certifications pursuant to SOX by Defendants Fields and Shanks, stating that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

52.    On April 27, 2017, Ford filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 10-Q").  For the quarter, Ford reported net income of $1.58 billion, or $0.40 per diluted share, on revenue of $39.14 billion,

compared to net income of $2.45 billion, or $0.61 per diluted share, on revenue of $37.71 billion for the same period in the prior year.

53.     The Q1 2017 10-Q contained signed certifications pursuant to SOX by Defendants Fields and Shanks, stating that the financial information contained in the Q1 2017 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

54.     On July 26, 2017, Ford filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2017 (the "Q2 2017 10-Q").   For the quarter, Ford reported net income of $2.04 billion, or $0.51 per diluted share, on revenue of $39.85 billion, compared to net income of $1.97 billion, or $0.49 per diluted share, on revenue of $39.48 billion for the same period in the prior year.

55.     The Q2 2017 10-Q contained signed certifications pursuant to SOX by Defendants Hackett and Shanks, stating that the financial information contained in the Q2 2017 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

56.     On October 26, 2017, Ford filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2017 (the "Q3 2017 10-Q").   For the quarter, Ford reported net income of $1.56 billion, or $0.39 per diluted share, on revenue of $36.45

billion, compared to net income of $957 million, or $0.24 per diluted share, on revenue of $35.94 billion for the same period in the prior year.

57.     The Q3 2017 10-Q contained signed certifications pursuant to SOX by Defendants Hackett and Shanks, stating that the financial information contained in the Q3 2017 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

58.     The statements referenced in ¶¶ 20-57 were materially false and misleading because defendants made false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, prospects and performance. Specifically, during the Class Period, Defendants made false and/or misleading statements and/or failed to disclose that: (i) flaws in the Company's manufacturing processes, supply chain, and/or quality control rendered at least 841,000 Ford vehicles unsafe to drive; (ii) the foregoing issues, when revealed, would foreseeably subject Ford to additional regulatory scrutiny and impact the Company's profitability; and (iii) as a result, Ford's public statements were materially false and misleading at all relevant times.

### The Truth Begins To Emerge

59.     On October 27, 2017, NHTSA announced a preliminary investigation into 841,000 Ford vehicles, citing concerns that the vehicles' steering wheels could detach while the vehicles are in motion.  In the NHTSA report, the federal agency

stated that it is specifically investigating 2014-2016 model Ford Fusion sedans, stating in relevant part that:

> The Office of Defects Investigation (ODI) has received three (3) Vehicle Owner Questionnaire (VOQ) reports alleging the steering wheel fastening bolt became loose in model years 2014 through 2016 Ford Fusion vehicles. ODI has received one (1) report on each model year. The VOQs stated that the steering wheel became loose while the vehicle was in operation. Two of the complainants reported that the bolt attaching the wheel to the steering column had to be re-tightened at a repair facility. The third complainant alleged that while attempting to turn into a gas station, the steering wheel became completely detached from the steering column. A detached steering wheel can result in a loss of vehicle control that may lead to a crash. A Preliminary Evaluation has been opened to assess the scope, frequency, and safety-related consequence of the alleged defect.

60. On this news, Ford's share price fell $0.21, or 1.71%, to close at $12.06 on October 27, 2017.

61. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

62. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Ford securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and

directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

63.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Ford securities were actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Ford or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

64.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

65.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

66.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Ford;

- whether the Individual Defendants caused Ford to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Ford securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

67.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

68.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Ford securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Ford securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

69.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

70.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

21

## COUNT I

**(Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

71.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

72.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

73.    During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ford securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Ford securities and

options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

74.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Ford securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Ford's finances and business prospects.

75.     By virtue of their positions at Ford, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each

23

defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

76. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Ford securities from their personal portfolios.

77. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Ford, the Individual Defendants had knowledge of the details of Ford's internal affairs.

78. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Ford. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Ford's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Ford securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Ford's business and financial condition which were concealed by defendants, Plaintiff and

the other members of the Class purchased or otherwise acquired Ford securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

79.    During the Class Period, Ford securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Ford securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Ford securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Ford securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

80.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

81.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

82.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83.     During the Class Period, the Individual Defendants participated in the operation and management of Ford, and conducted and participated, directly and indirectly, in the conduct of Ford's business affairs.  Because of their senior positions, they knew the adverse non-public information about Ford's misstatement of income and expenses and false financial statements.

84.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Ford's financial condition and results of operations, and to correct promptly any public statements issued by Ford which had become materially false or misleading.

85.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ford disseminated in the marketplace during the Class Period concerning Ford's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Ford to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Ford within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ford securities.

86.     Each of the Individual Defendants, therefore, acted as a controlling person of Ford.  By reason of their senior management positions and/or being directors of Ford, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Ford to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Ford and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

87.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Ford.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:   October 30, 2017

Respectfully submitted,

**POMERANTZ LLP**
*/s/Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:   (212) 661-8665
Email:  jalieberman@pomlaw.com
           ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
peretz@bgandg.com

***Attorneys for Plaintiff***